# CHARLESTON.

CHARLESTON NATURAL GAS CO. *v.* LOWE & BUTLER, TRUSTEES, *et als.*

Submitted February 2, 1901.   Decided March 30, 1901.

1. INCORPORATED CITY—*Private Property—Public Use.*
   Supplying an incorporated city or town and its inhabitants with natural gas for the purpose of heating and illumination, by a corporation organized under the general laws of the State, and occupying the streets and alleys of such city or town for the purpose by means of the location therein of its pipes, connections, boxes, valves and other fixtures, under an ordinance of the city or town, is a public use for which such company may take private property, in the manner prescribed by chapter 42, of the Code, upon which to locate its pipe line.   (p. 664).

2. INCORPORATED CITY—*Gas Company.*
   Such company is bound to furnish gas to every inhabitant of such city or town who applies therefor and complies with the regulations prescribed by the ordinances of the town, or fixed by contract between the council and the company.   (p. 671).

Writ of error and *supersedeas* from the Circuit Court, Kanawha County.

Action by Charleston Natural Gas Co. against Lowe & Butler, Trustees, *et als.*   Judgment for defendants, and plaintiff brings error.

*Reversed.*

BROWN, JACKSON & KNIGHT, for plaintiff in error.

MOLLOHAN, MCCLINTIC & MATHEWS, for defendant in error.

POFFENBARGER, JUDGE:

The common council of the city of Charleston having passed an ordinance reciting the probability of the discovery of natural gas, sufficiently near said city to make it practicable to transport the same to it, the anticipation that the use of such gas for domestic and manufacturing purposes will add largely to the wealth and prosperity of the city as well as contribute to its health and cleanliness; and the desirability of the adoption of such municipal regulations as shall provide against the waste of said gas, and afford to the citizens of Charleston facilities for the receipt thereof upon a uniform system which shall be protective of life and property so that gas may be economically used; and granting to William Seymour Edwards and his associates, their successors and assigns the right and privilege of opening and using the streets and alleys of the city for laying pipes for the purposes of conveying natural gas with the necessary street boxes and valves, and making the necessary street connections subject to certain conditions providing for indemnity to the city against damages, fixing a limit of time within which the grantees should accept the franchises and be ready to supply gas to consumers, and requiring them when ready, so to deliver, to file with the recorder of the city a statement of the price or cost to consumers, not to be increased except by consent of the council; said franchise was assigned by said parties to the Charleston Natural Gas Company.

This company owns a gas well in Boone County from which it desires to convey gas by means of pipes to Charleston, and for the purpose of constructing its pipe line it desires to take five small parcels of land, the legal title to which is in B. F. Butler and A. Augustus Lowe, trustees. These parcels are sixty-five, forty, one thousand one hundred, one hundred and twenty, and one hundred and sixty-eight feet long respectively, and ten feet wide, and being unable to agree upon a price therefor with the owners, the company filed its petition in the circuit court of Kanawha for the condemnation of said strips of land for the use of its pipe line. The trustees and their *cestius que trust* appeared and demurred to the petition, and the demurrer being sustained and the petition dismissed, the petitioner was allowed a writ of error to, and *supersepeas* from the order.

It is contended by counsel for the defendants that in order that the lands may be condemned it must be shown that the use for which they are wanted is clearly and unmistakably a public use in the legal sense of the words, as defined by the courts, that their condemnation is authorized by statute and that the statutes, if any, authorizing it, are not unconstitutional. These propositions cannot be controverted. It is the province of the legislature to declare the public uses for which private property may be taken, but the power of the legislature in this respect is limited by the Constitution, and it remains with the courts to say whether the legislative enactment making such declaration and appropriation is in conflict with the constitutional limitation, and if so, to declare it unconstitutional and void. *B. & O. R. R. Co.* v. *P. W. & Ky. R. R. Co.,* 17 W. Va. 812; *Verner* v. *Martin,* 21 W. Va. 534; *Boom Co.* v. *Patterson,* 98 U. S. 403.

When the court has determined that the use for which property is condemned is a public use, its judicial function is gone and the legislative discretion is unrestrained. Whether the proposed plan will accomplish the end proposed, or to what exent it will be beneficial to the public, are not matters to be determined by the courts; these are matters belonging to the legislative discretion. *Varner* v. *Martin, supra.*

The only question to be determined in this case is, therefore, whether the use for which the land is sought to be taken is a public use, and this involves an inquiry as to the interest the public will have in the operation of the proposed pipe line of this company, it being insisted by the defendants that the operations of this company are not subject to such legislative regulation and control as to vest in the public a right to a certain definite use of the property proposed to be taken. Although clause 5 of section 2 of chapter 42 of the Code declares private property may be taken for companies organized for the purpose of transporting carbon oil or natural gas, or both, by means of pipes or otherwise, and qualifies this right by the words, "when for public use," neither that clause nor any other part of said chapter contains any further guaranty of the public interest or right in the property which may be so taken, or any regulations or restrictions upon such companies to prevent them from excluding the public from a benficial interest in it. Section 24 of chapter 52, Code, provides that, "A company organized for the

purpose of transporting natural gas, petroleum or water, necessary for use in carrying out the provisions of this act in piping and transporting natural gas and petroleum or for boring for the same, through tubing and pipes, may enter upon any land for the purpose of examining and surveying a line for its tubing and pipes, and may appropriate so much thereof as may be deemed necessary for the laying down of such tubing and piping, and for the erection of tanks and the location of stations along such line, and the erection of such buildings as may be necessary for the purpose aforesaid; such appropriations shall be made and conducted in accordance with the law providing for compensation to the owners of private property taken for public use."

After provisions not material to this controversy, said section further declares: "Such company shall, for the purpose of transporting natural gas, oils and water, be considered and held to be a common carrier, and subject to all the duties and liabilities of such carriers under the laws of this state." This section imposes no regulations, rates or limitations upon companies organized for transporting natural gas other than that they shall be common carriers.

Chapter 27, Acts 1879, as amended and re-enacted by chapter 44 of the Acts of 1891, regulates the transportation and storage of petroleum, and compels all persons, corporations and companies to conform to the regulations thereby prescribed, one of which is that they shall accept all petroleum offered to them in sufficient quantities and in merchantable order, and transport and deliver the same at any delivery station within or without the state, on the route of its line of pipes which may be designated by the owners of the petroleum so offered. The act also fixes maximum rates for transporting and storing petroleum and provides for testing it and for monthly statements to be made by such persons and companies, and imposes numerous duties upon them and their agents. But this act is silent as to natural gas.

It is contended that under the principles laid down by this Court the purpose for which the petitioner seeks to take the land is not a public use, and this objection is based largely upon the absence of any legislative regulations applicable to the transportation and handling of natural gas, similar to those applicable to mills, ferries, railroads, oil pipe lines and other agencies

having an undoubted right to condemn private property for their purposes.

In *Varner* v. *Martin,* 21 W. Va., the Court held as follows: "Where the title and control of the property to be condemned is in private hands or in a corporation, three qualifications are necessary to impose upon it such a public use as will justify the taking of such private property without the consent of the owner. (1) The use which the public is to have of such property must be fixed and definite. The general public must have a right to a certain, definite use of the private property on terms and for charges fixed by law: and the owner of the property must be compelled by law to permit the general public to enjoy it. * * * * * *(2) This use of the property which in such cases the public must have, must be a substantially beneficial use, which is obviously needful for the public to have, and which it could not do without except by suffering great loss or inconvenience. (3) And when the title of the property is thus transferred by condemnation to the individual or to a corporation, the necessity for such condemnation must be obvious. It must obviously appear from the location of the property proposed to be condemned or from the character of the use to which it is to be put, that the public could not without great difficulty obtain the use of this land or of other land which would answer the same general purpose, unless it was condemned. And in such case the courts will judge of the necessity for confirming such condemnation."

This is approved in *Railroad Co.* v. *Iron Works,* 31 W. Va. 710; and in *Cemetery Asso.* v. *Redd,* 33 W. Va. 263.

In *Salt Co.* v. *Brown,* 7 W. Va. 191, JUDGE PAUL said: "What then constitutes a public use, as contradistinguished from a private use? The most extended research will not likely result in the discovery of any rule or set of rules or principles of certain and uniform application, by which this question can be determined in all cases. Eminent jurists and distinguished writers upon public law, do not express concurrent or uniform views upon this subject. It is a question from its very nature, of great practical, perhaps of insuperable difficulty, to determine the degree of necessity, or the extent of public use, which justifies the exercise of this extraordinary power upon the part of

a state, by which the citizen, without his will, is deprived of his property. '

What is a public use is incapable of exact definition. The expressions public interest and public use are not synonymous. The establishment of furnaces, mills and manufactures, the building of churches and hotels, and other similar enterprises are more or less matters of public concern, and promote in a general sense, the public welfare. But they lie without the domain of public uses for which private ownership may be displaced by compulsory proceedings." *Niagara Falls* v. *Whirlpool R. R. Co.,* 108 N. Y. 375.

In Lewis on Em. Dom. sec. 165 it is said: "The use of a thing is strictly and properly the employment or application of the thing in some manner. The public use of a thing is the employment or application of the thing by the public. Public use means the same as use by the public. * * * If the constitution means that private property can be taken only for use by the public, it affords a definite guide to both the legislature and the courts. Though the property is vested in private individuals or corporations, the public retain certain definite rights to its use or enjoyment, and to that extent it remains under the control of the legislature. If no such rights are secured to the public, then the property is not taken for public use, and the act of appropriation is void."

The character of the agencies employed in applying the property to the use of the public is wholly unimportant in determining whether or not the use is public or private. They may be municipal corporations, private corporations or individuals. Nor is it material that while the public has a fixed, definite and certain interest or use in the property, the private corporations or individuals upon whose application the condemnation is made derive private gain, and advantage from the enterprise. It is enough that the purpose is one of public necessity or great public convenience and is made certainly and directly subservient to public use and to such an extent that the use cannot be defeated, withdrawn nor withheld by the agency in whose hands it is thus placed. Under such conditions the property is not transferred from one private purpose or use to another private use, but is devoted to a public use, and therefore within the

power of legislative appropriation. It remains subject to legislative control. But it is not enough that the general prosperity of the community will be promoted by the enterprise or purpose for which the property is sought to be taken, such as the opening of mines, operation of factories &c. *Salt Co.* v. *Brown, supra.; Varner* v. *Martin, supra.*

It is apparent that a railroad carrying passengers and freight a pipe line transporting oil, a ferry or bridge conveying passengers across streams, are public necessities, as much so as common highways, or the navigation of the waters. School houses, court houses, city buildings and other structures erected for the use of public officers and at public expense from funds raised by taxation are purely of a public nature. The reason for deeming a water-grist mill of a public nature is also clear. The purpose for which the land is sought to be taken in this instance differs very materially from all of these. It partakes somewhat of the nature of the use to which property is applied when taken for the purpose of supplying water to a city. It has none of the characteristics of a common carrier, nor is it in any sense a use for the purposes of a highway. Here the city of Charleston is the place to be supplied with gas. It is situated at one of the termini of the line, just as a city at the end of an acqueduct, conveying water to it. It is very well settled by the authorities that the power of eminent domain may be invoked for the purpose of supplying water to cities. *Gardner* v. *Trustees,* 2 John. Chy. 161; *Inhabits. of Wayland* v. *Commissioners,* 4 Gray 500; *Kane* v. *Baltimore,* 15 Md.

"The public health of cities requires an abundant supply of pure water, and for this purpose land may be condemned for reservoirs and other facilities for supplying cities with water. * * * In like manner supplies of water may be condemned." Mills Em. Dom. sec. 18.

"The condemnation of property for public sewers or works for the disposition of sewerage, for supplying a city or town with water, or gas, is so manifestly for public use that it has been seldom questioned and never denied. So supplying a city and its inhabitants with natural gas is a public use." Lewis on Em. Dom. sec. 173.

Natural gas is not so essential to the inhabitants of a city or town as water. But it will hardly be contended by anybody

that, in order to make the use public in that sense which will warrant the appropriation of private property to it, it must be necessary to the preservation of life, or of such character that its place cannot be supplied by something else./

Chief Justice Marshall in criticising the term "necessary" in *McCulloch* v. *Maryland*, 4 Wheat. 414 said: "It does not always import an absolute physical necessity so strong that one thing to which another may be termed necessary, cannot exist without that other. If reference be had to its use in the common affairs of the world, or in approved authors, we find it frequently imports no more than that one thing is convenient, or useful or essential to another. To employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable."

It is as clearly apparent that the necessity of the use as regards the public interests is not an absolute physical necessity, as that public use is not synonymous, or co-extensive with public utility, benefit, advantage or welfare. It is sufficient if it be a reasonably well adapted means for the accomplishment of one or more of the ordinary ends of public necessity or convenience.

Natural gas has become a recognized means of lighting streets, public buildings, business houses and private residences, and of furnishing heat, all of which are necessary to the municipal and individual purposes of cities and towns. "Heating being an agent or principle indispensable to the health, comfort and convenience of every inhabitant of our cities, we do not see why, through the medium of natural gas, it may not be as much a public service to furnish it to the citizens, as to furnish water. It is inquired, why do not municipalities also purchase coal mines and issue their bonds therefor, and embark in the business of mining and selling coal to private consumers? An obvious reply is that coal and other fuel may be carried to the consumer by the ordinary channels of transportation, at a comparatively moderate expense, while in conveying natural gas, streets must be opened, pipes laid, works erected, fixtures and machinery purchased, and other expenses incurred, beyond the

enterprise and capital of an individual. *State* v. *City of Toledo*, 48 Ohio St. 112.

In *Bloomfield, &c., Natural Gas Light Co.* v. *Richardson,* 63 Barb. (N. Y.) 437, decided in 1872, the court said: "The use of gas for illuminating purposes has become almost a necessity of modern civilization. The right to take the private property of those who own the fee of streets and highways may be absolutely necessary to the public enjoyment of the benefits of this invention, and we think there can be no doubt, upon principle, and upon the adjudicated cases that the conduction of illuminating gas, with such public objects as are specified in the act conferring the special powers upon this company is within the category of those public improvements to enable which to be carried out, the legislature may confer upon the parties engaged in the enterprise, the right to take the private property necessary to effect the object, upon making compensation according to the constitution." That was a suit, the object of which was to condemn private property for the use of a private corporation organized to conduct natural gas to cities by mains, to sell and supply gas for lighting the streets, public parks, dwellings and other buildings therein,—just such a case as we have here.

But it is claimed in this case that the beneficial use or enjoyment of the property sought to be taken, by the public, is not secured by any statutory regulation, as hereinbefore pointed out. It is true we have no general statute of that kind. Why this has been omitted, we cannot inquire, but it must be apparent to all that there is a vast difference between gas and oil, and that it would be difficult to apply the regulations peculiar to common carriers to pipe line for conveying gas, for the reason that it is utterly incapable of being deposited in bottles, barrels casks and tanks, at the end of a pipe line. Its nature requires that it be confined absolutely from the moment it comes from the earth, until it is used, and from the spot of its source to the point of consumption.

There is also a limit beyond which it is impracticable to convey it for use, and its principal use is confined to the purposes of illumination and heat in the cities and towns. The transportation and use of it seems therefore, to be susceptible of but little regulation beyond fixing a maximum price to the con-

sumer, and this the municipal corporations to which the legis-
lature has qualifiedly delegated powers of local government have
ample authority to regulate as well as to impose terms and condi-
tions such as will insure safety to the lives and property of citi-
zens in its use. But have the citizens of Charleston an absolute
and indefeasible right to the use of the gas upon reasonable and
equal terms? Is the company bound to furnish gas to all who
apply for it without an express legislative imposition of that
duty upon it? Undoubtedly. The courts have so held in many
of the states, and their decisions are grounded upon both reason
and the best of authority.

In *Gibbs* v. *Balt. Gas Co.,* 130 U. S. 396, Chief Justice Fuller,
delivering the opinion of the court says: "These gas companies
entered the streets of Baltimore under their charters in the exer-
cise of the equivalent of the power of eminent domain, and are to
be held as having assumed an obligation to fulfill the public pur-
poses to subserve which they were incorporated."

In *Munn* v. *Illinois,* 94 U. S. 113, Chief Justice Waite said:
"Enough has already been said to show that, when private prop-
erty is devoted to a public use, it is subject to public regula-
tion."

Occupying the streets of Charleston by permission of its coun-
cil, first had, for the purpose of supplying to the inhabitants
natural gas, the company is bound to furnish gas to every citi-
zen applying therefor and willing to pay the prices agreed upon
between the company and the city. The occupancy of the streets
by such a company can only be for purposes in which the public
is concerned, and the obligations thus assumed by the company,
whether expressly incorporated in the franchise or not, will be
enforced.

"A gas company is of a public nature, if it exercises its right
by virtue of a state law and local ordinances; and wherever with
in its assigned limits it has connected its mains and service pipes
and fixtures of individuals, it is bound to supply them with gas,
on reasonable conditions, when they ask it." *Williams* v. *Mu-
tual Gas Co.,* 52 Mich. 499. Substantially the same is held in
*Shephard* v. *Milwaukee G. L. Co.,* 6 Wis. 539; *G. L. Co.* v. *Colla-
day,* 25 Md. 1; *Coy* v. *Ind. Gas. Co.,* 146 Ind. 65; *Portland Nat.
Gas and Oil Co.* v. *State exrel Keen,* 135 Ind. 54.

The same has been held in cases concerning water companies,

which as shown are so nearly akin to gas companies. In *Olmstead* v. *Acq. Co.,* 47 N. J. L. 311, we find: "Although the acqueduct charter contains no express provision requiring the company to supply all consumers. * * * In accepting such charter the company impliedly engages to use it in a manner that will accomplish the legislative design. It is thereby bound to supply on reasonable terms all who apply for water."

In *Lombard* v. *Stearns,* 4 Cush. (Mass.) 60, the court held: "By accepting the act of incorporation they undertook to do all the public duties required of it."

Another objection urged is that no right to the use of gas is secured to persons living outside of Charleston along the proposed pipe line. Whether the company is bound to furnish them and upon what terms it is not necessary to determine. It is sufficient that the principal object or purpose to which the property is to be devoted is supplying gas to the city of Charleston, all of whose citizens have a fixed and beneficial use, clearly shown to be a public use. It is no objection that this proposed public use is confined in the matter of locality to Charleston, if such is the case. "It is not necessary that the entire community, or any considerable portion of it, should directly participate in the benefits to be derived from the property taken." Lewis on Em. Dom. sec. 161; citing many authorities.

The circuit court having erred in dismissing the petition, its judgment is reversed and the cause remanded.

BRANNON, President, DENT and McWHORTER, Judges, concur in the foregoing opinion.

*Reversed.*