## MARIA APOSPOROS ET AL. *v.* URBAN REDEVELOPMENT COMMISSION OF THE CITY OF STAMFORD
### (SC 16450)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 25, 2001—officially released March 5, 2002

*John Wayne Fox*, with whom were *John Louizos* and, on the brief, *Patricia M. Gaug*, for the appellants (plaintiffs).

*Robert Dolian*, with whom, on the brief, were *Charles D. Ray* and *Claire E. Ryan*, for the appellee (defendant).

*Andrew J. McDonald*, corporation counsel, with whom, on the brief, was *James V. Minor*, assistant

corporation counsel, for the appellee (intervening defendant).

*Opinion*

SULLIVAN, C. J. The plaintiffs, Maria Aposporos and Ellen Begetis, appeal from the judgment of the trial court denying their request for a permanent injunction prohibiting condemnation proceedings by the defendants, the urban redevelopment commission of the city of Stamford (commission) and the city of Stamford (city). On appeal, the plaintiffs claim that the trial court improperly: (1) concluded that the defendants had complied with the time requirements of General Statutes § 8-128; (2) concluded that the defendants had complied with the conditions imposed by the local legislative body in authorizing the condemnation of the plaintiffs' property; (3) declined to review the plaintiffs' claim that the condemnation was invalid in the absence of sufficient findings of blighted conditions; and (4) concluded that a court order was sufficient to extend the defendants' authority to proceed with the condemnation after the expiration of the deadline set by the local legislative body. We agree with the plaintiffs' third claim and conclude that the defendants were required to establish that the plaintiffs' property was in a redevelopment area before amending the redevelopment plan to provide for acquisition of the property. We further conclude that their failure to do so rendered the condemnation proceedings invalid. Accordingly, we need not consider the remaining claims.

The record reveals the following relevant facts and procedural history. In March, 1963, the city's board of representatives (board) approved an urban renewal plan entitled "Urban Renewal Plan for the Southeast Quadrant (Extended) Urban Renewal Project" (1963 plan) pursuant to General Statutes § 8-124 et seq., the Connecticut redevelopment act (act). In 1977, the plain-

tiffs jointly acquired the property located at 62 West Park Place in Stamford (property). Since that time, they have operated a diner, known as Curley's Diner, on the property. At the time that the plaintiffs acquired the property, it was in the area of the city affected by the plan, but it was not identified in the plan as a property to be acquired.

In the mid-1980s, merchants located in the area of Stamford subject to the plan became concerned about the effect that the construction of a mall in another part of the city would have on their businesses. In response to those concerns, the then mayor of Stamford, Thom Serrani, appointed a citizens committee to explore ways to revitalize the area. In addition, the commission and the board's urban redevelopment committee were asked to recommend new redevelopment goals. The commission hired an urban design development firm to conduct a study of the issue. The firm ultimately recommended that the defendants acquire four properties in addition to those already acquired pursuant to the plan, including the property owned by the plaintiffs.

On the basis of the design firm's recommendations, the commission developed a plan for the construction of housing, including affordable housing, and retail stores in the redevelopment area. The commission also proposed amendments to the 1963 plan to authorize, among other things, the acquisition of the four properties. Public hearings were held on the amendments, after which the commission submitted the amendments to the board for approval. The board, by resolution number 1819 (1988 resolution), approved the amendments on March 7, 1988. The resolution directed the commission to "take all steps necessary to carry out the Urban Renewal Plan, as so amended, in an expeditious and timely manner . . . ." It also provided that "no real property acquisitions as set forth in the Pro-

posed Amendments shall be undertaken until such time as this Board approves a Land Disposition Agreement for Re-use parcels 16A, 16B, 19 and 19B." The plaintiffs' property is located in block 9, lot 24, of reuse parcel 19B. The resolution also required the commission "to negotiate a Land Disposition Agreement that optimizes the affordable housing component attendant to the development of the combination of Re-use parcels 16A, 16B, 19 and 19B."

Following the adoption of the 1988 resolution, the commission solicited developers by placing advertisements in national trade journals. The commission received approximately twenty responses, from which it selected four developers to submit proposals. Ultimately, it selected the Lincoln Properties proposal for the construction of a sixteen story tower on the property and the parties negotiated a land disposition agreement. Because of a downturn in the real estate market, however, the parties were unable to obtain financing for the development, and the deal fell through.

Shortly before the 1963 plan, as amended, was due to expire, the board, on October 5, 1992, adopted a resolution extending the plan to March 4, 2000. In 1996, when the real estate market began to recover, the commission issued another request for proposals. Three developers submitted proposals, from which the commission selected Corcoran Jennison/Berkeley Partners, Inc. (Corcoran Jennison). The commission drafted a land disposition agreement (draft agreement) incorporating the proposal and submitted it to the board for approval. Various members of the board expressed concerns about certain provisions of the draft agreement and requested that the commission renegotiate those provisions. The commission negotiated modifications to the agreement and submitted them to members of the board's urban renewal committee at a meeting on October 22, 1997. At a November 5, 1997 board meeting,

committee chairman Alice Fortunato reported to the board that the committee had approved the agreement as modified.

On November 17, 1997, the board passed resolution number CA1197 (1997 resolution). The resolution was entitled "RESOLUTION NO. CA1197 CONCERNING APPROVAL OF A CONTRACT FOR THE SALE OF LAND IN THE SOUTHEAST QUADRANT (EXTENDED) URBAN RENEWAL PROJECT FOR PRIVATE REDE-VELOPMENT TO CORCORAN JENNISON/BERKELEY PARTNERS, INC.," and referred to the land disposition agreement entitled "Contract for Sale of Land for Private Redevelopment Reuse Parcels 16A, 16B, 19 and 19B" that had been approved by the commission on August 18, 1997. On June 15, 1998, the mayor executed a contract with Park Square West LLC, a fully owned subsidiary of Corcoran Jennison. The contract included the modifica-tions that had been negotiated by the commission and approved by the board's urban renewal committee.

During the year following the approval of the 1997 resolution, the commission developed construction plans and obtained financing for the construction. In November, 1998, construction of phase I of the project began. In November, 1999, the commission began the process of acquiring certain property, including the plaintiffs' property, which was required for phase II of the project. Specifically, the commission sought propos-als for an appraisal report, selected an appraiser and met with property owners and their attorneys to discuss the appraisals. On December 20, 1999, the commission filed a statement of compensation for the plaintiffs' property in the amount of $233,000.

The plaintiffs filed this action against the commission on December 28, 1999, seeking a temporary restraining order preventing the commission from condemning the

property, temporary and permanent injunctive relief preventing the commission from condemning the property, a declaratory ruling that the taking of the property was unconstitutional, a declaratory ruling that the actions taken by the commission were illegal, arbitrary and exceeded the scope of its condemnation authority, and reasonable attorney's fees pursuant to General Statutes § 48-17a. The trial court immediately granted an ex parte temporary restraining order.

On January 12, 2000, the city filed a motion to intervene in the action, which the trial court granted on January 24, 2000. On February 25, 2000, the commission moved for a stay of the March 4, 2000 expiration of the plan. The trial court granted the motion on March 3, 2000. On March 6, 2000, the board approved a resolution extending the plan's expiration date to July 5, 2000.

A trial on the plaintiffs' claim for temporary and permanent injunctive relief was held on June 8 and 9, 2000. On October 31, 2000, the trial court rendered judgment denying the plaintiffs' claim for an injunction against the condemnation proceedings. The plaintiffs then filed this appeal in the Appellate Court. Thereafter, this court transferred the appeal to itself pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the plaintiffs make four claims. First, they claim that the trial court improperly concluded that the defendants had complied with the time requirements of § 8-128.[1] Specifically, they claim that the defendants

---

[1] General Statutes § 8-128 provides: "Within a reasonable time after its approval of the redevelopment plan as hereinbefore provided, the redevelopment agency may proceed with the acquisition or rental of real property by purchase, lease, exchange or gift.The redevelopment agency may acquire real property by eminent domain with the approval of the legislative body of the municipality and in accordance with the provisions of sections 8-129 to 8-133, inclusive, and this section. The legislative body in its approval of a project under section 8-127 shall specify the time within which real property is to be acquired. The time for acquisition may be extended by the legislative body in accordance with section 48-6, upon request of the redevelopment agency, provided the owner of the real property consents to such request.

did not condemn their property within a "reasonable time" from the adoption of the 1988 resolution and that the 1997 resolution did not specify the time within which the property was to be acquired. Second, they claim that the trial court improperly found that the defendants had complied with the board's conditions, namely, that: (1) they enter into an authorized land disposition agreement before acquiring the property, because the modified land disposition agreement executed by the city was not the same agreement that was authorized in the 1997 resolution; (2) the commission implement the plan "in an expeditious and timely manner"; and (3) the defendants negotiate a land disposition agreement that "optimizes" the affordable housing in the development. Third, they claim that the trial court improperly declined to review their claim that the condemnation was invalid in the absence of a renewed finding of blight. Fourth, they claim that the trial court improperly concluded that it had authority to extend the deadline for expiration of the redevelopment plan by court order.

We address only the plaintiffs' third claim because it is dispositive of this case.[2] We begin by setting forth

Real property may be acquired previous to the adoption or approval of the project area redevelopment plan, provided the property acquired shall be located within an area designated on the general plan as an appropriate redevelopment area or within an area whose boundaries are defined by the planning commission as an appropriate area for a redevelopment project, and provided such acquisition shall be authorized by the legislative body. The redevelopment agency may clear, repair, operate or insure such property while it is in its possession or make site improvements essential to preparation for its use in accordance with the redevelopment plan."

[2] We note, preliminarily, that the defendants assert that this claim was not properly preserved because it was not raised by the plaintiffs until they filed their posttrial brief in the trial court. We disagree. In their posttrial brief, the plaintiffs argued that there was no evidence that the current conditions of the property or the surrounding area met the requirements for a redevelopment area or that condemnation of the property was necessary or would serve a public purpose by eradicating blight. The defendants, in their posttrial brief, argued that because the evidence at trial showed that acquisition of the property was necessary to carry out the redevelopment

forth the standard of review pertaining to a trial court's ruling on a request for an injunction. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Walton* v. *New Hartford*, 223 Conn. 155, 165, 612 A.2d 1153 (1992).

Under the act, "a redevelopment area is defined as one 'which is deteriorated, [deteriorating] substandard or detrimental to the safety, health, morals or welfare of the community.' [General Statutes § 8-125 (b).] It is with reference to such an area that a local redevelopment agency is authorized to prepare a plan for redevelopment and, in the execution of the plan, take private property by condemnation. . . . Private property taken for the purpose of eradicating the conditions which obtain in such areas is taken for a public use." (Citations omitted.) *Gohld Realty Co.* v. *Hartford*, 141 Conn. 135, 142–43, 104 A.2d 365 (1954).

"The determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclu-

---

plan, the plaintiffs' claim that the property was not blighted, deteriorated or substandard was irrelevant. The defendants did not argue to the trial court that the claim was unpreserved. The trial court addressed the issue in its memorandum of decision, concluding that, although "[d]eterminations that were made forty, twenty, and even twelve years ago seriously undermine confidence in making reliable condemnation decisions . . . [t]he court has no discretion on factual findings regarding 'blighted areas.' " On the basis of this record, we conclude that the issue was fairly before the trial court and was adequately preserved for review by this court.

sive; it is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred." Id., 146.

"[A] redevelopment area [is] . . . expressly permitted to 'include structures not in themselves substandard or insanitary which are found to be essential to complete an adequate unit of development, provided that the redevelopment area is deteriorated, [deteriorating] substandard or detrimental.' [General Statutes § 8-125 (b).]" *Pet Car Products, Inc.* v. *Barnett*, 150 Conn. 42, 51, 184 A.2d 797 (1962). "In the determination whether property which is not substandard is essential to the plan of redevelopment, it is the condition obtaining as to the entire area and not as to individual properties which is determinative." (Internal quotation marks omitted.) Id.

General Statutes § 8-127[3] provides in relevant part that "[b]efore approving any redevelopment plan, the

[3] General Statutes § 8-127 provides: "The redevelopment agency may prepare, or cause to be prepared, a redevelopment plan and any redeveloper may submit a redevelopment plan to the redevelopment agency, and such agency shall immediately transmit such plan to the planning agency of the municipality for its study. The planning agency may make a comprehensive or general plan of the entire municipality as a guide in the more detailed and precise planning of redevelopment areas. Such plan and any modifications and extensions thereof shall show the location of proposed redevelopment areas and the general location and extent of use of land for housing, business, industry, communications and transportation, recreation, public buildings and such other public and private uses as are deemed by the planning agency essential to the purpose of redevelopment. Appropriations by the municipality of any amount necessary are authorized to enable the planning agency to make such comprehensive or general plan. The redevelopment agency shall request the written opinion of the planning agency on all redevelopment plans prior to approving such redevelopment plans. Before approving any redevelopment plan, the redevelopment agency shall hold a public hearing thereon, notice of which shall be published at least twice in a newspaper of general circulation in the municipality, the first publication of notice to be not less than two weeks before the date set for the hearing. The redevelopment agency may approve any such redevelopment plan if, following such hearing, it finds that: (a) The area in which the proposed redevelopment is to be located is a redevelopment area; (b) the carrying out of the redevelopment plan will result in materially improving conditions

redevelopment agency shall hold a public hearing thereon, notice of which shall be published at least twice in a newspaper of general circulation in the municipality, the first publication of notice to be not less than two weeks before the date set for the hearing. The redevelopment agency may approve any such redevelopment plan if, following such hearing, it finds that: (a) The area in which the proposed redevelopment is to be located is a redevelopment area . . . "

"The authority to condemn is to be strictly construed in favor of the owner and against the condemnor, and the prescribed method of taking must be strictly pursued." *Simmons* v. *State*, 160 Conn. 492, 500, 280 A.2d 351 (1971). "The rule applicable to the corporate authorities of municipal bodies is that when the mode in which their power is to be exercised is prescribed, that mode must be followed." *Sheehan* v. *Altschuler*, 148 Conn. 517, 523–24, 172 A.2d 897 (1961). When essential steps are not taken as required by the statute for the adoption of a redevelopment plan, the purported plan, as well as any attempted approval of it and any action taken under it, are invalid. Id., 524.

The plaintiffs do not dispute that a valid finding of blight was made in 1963 when the redevelopment plan was adopted, but they argue that that finding is now

in such area; (c) sufficient living accommodations are available within a reasonable distance of such area or are provided for in the redevelopment plan for families displaced by the proposed improvement, at prices or rentals within the financial reach of such families; and (d) the redevelopment plan is satisfactory as to site planning, relation to the comprehensive or general plan of the municipality and, except when the redevelopment agency has prepared the redevelopment plan, the construction and financial ability of the redeveloper to carry it out. No redevelopment plan for a project which consists predominantly of residential facilities shall be approved by the redevelopment agency in any municipality having a housing authority organized under the provisions of chapter 128 except with the approval of such housing authority. The approval of a redevelopment plan may be given by the legislative body or by such agency as it designates to act in its behalf."

stale and does not relate to the redevelopment area identified for acquisition in the 1988 amendment that includes their property. Accordingly, they argue that the defendants were acting outside the scope of their authority in amending the plan to provide for acquisition of the property. Indeed, in its memorandum of decision, the trial court observed that "[d]eterminations that were made forty, twenty, and even twelve years ago seriously undermine confidence in making reliable condemnation decisions. Did the Board have substantial evidence of the most recent vintage when it came to the blight determination so as to conduct a full hearing and render an honest, reasonable and fair judgment as to Curley's Diner?" The court concluded, nevertheless, that "a reasonable inference can be made based upon the extensions of time to complete the current plan that the point of urban blight was recently considered. If new factual findings regarding blight are needed, it is within the Board's discretion, not that of the court." Thus, it is not clear whether the trial court determined that a renewed finding of blight was implicit in the 1988 and 1997 resolutions or that the commission was entitled to rely on the 1963 finding.[4] In either case, however, we conclude that the finding was insufficient to validate the condemnation of the plaintiffs' property.

This court previously has not considered the effect of a prolonged lapse of time after an initial finding

---

[4] We note that in its posttrial brief the commission expressly had denied that it was required to establish that the area targeted for acquisition was blighted. It argued that, because it had proven at trial that the acquisition of the plaintiffs' property was necessary for construction of the project approved in the 1997 resolution, the issue of blight was irrelevant. In its brief to this court, the commission again argued that the plaintiffs' property is essential to the project and that it is undisputed that the project is a public use. We conclude, however, that the fact that the plaintiffs' property is essential for the project and the fact that the project is a public use are irrelevant if the purpose of the project was not to eradicate blight, the only public use for which the agency is authorized to acquire property.

of blight on the scope of a redevelopment agency's authority to act pursuant to a redevelopment plan. The Supreme Court of Appeals for West Virginia, however, considered this issue in *Charleston Urban Renewal* v. *Courtland Co.*, 203 W. Va. 528, 509 S.E.2d 569 (1998). The Charleston city council had declared on September 4, 1984, that an area of the city, in which the property of the condemnee was located, was a " 'slum and blighted' " area. Id., 530–31. One year later, the city and its urban redevelopment agency adopted an urban renewal plan providing for the acquisition of that property. Id., 531. The urban redevelopment agency did not formally authorize acquisition of the property, however, until May 8, 1996. Id. Condemnation proceedings were initiated on March 30, 1997. Id. The condemnee challenged the condemnation proceedings, claiming that the 1984 findings were outdated and, therefore, that (1) the proceedings were unconstitutional because acquisition of the property no longer served a " 'public use' "; and (2) the eminent domain proceeding was ultra vires because the statutory prerequisites of blight or slum conditions were no longer present. Id., 534.

The court noted that the condemnee was not challenging the validity of the initial determination of blight and slum conditions, but was asking the court to make a factual determination that those conditions no longer existed. Id., 535. The court concluded that a request "to make such a determination de novo, as opposed to asking a court to review a city council or authority determination under an appropriate standard of review, raises substantial issues of exhaustion of remedies, separation of powers, and similar concerns." Id. The court also noted that "the viability of an incremental, multiyear, integrated plan for the overall redevelopment of a slum or blighted area would be fatally compromised if challenges to the continued need for and legitimacy of the plan based on allegedly changed circumstances

were allowed as defenses to a condemnation petition—each time an urban renewal authority seeks to acquire property to accomplish the purposes of the plan. We are not directed to nor have we found any cases or statutes suggesting that such challenges are, have been, or should be allowed." Id. The court concluded that "absent extraordinary circumstances, the authority of an urban renewal authority acting under the provisions of [the relevant statutes] to implement an approved and ongoing redevelopment plan by using the power of eminent domain . . . may not be challenged during the period of the plan simply on the basis that the slum or blighted conditions which provided the initial basis for the adoption of the plan no longer exist." Id.

The court in *Batmasian* v. *Boca Raton Community Redevelopment Agency*, 580 So. 2d 199 (Fla. App. 1991), also considered the issue before us in this case. It concluded that "[a] logical consequence of the implementation of a redevelopment plan in any particular area is that some conditions of blight which once existed will be eliminated. Therefore, it is unreasonable to expect that the [redevelopment agency] demonstrate the existence of the same level of blight [at the time eminent domain proceedings are initiated] that was present when the redevelopment plan was initially adopted [seven years earlier]." Id., 201.

We agree with the West Virginia and Florida courts, and with the defendants, that it would be illogical and unfair to require a redevelopment agency to determine that the level of blight that existed at the time that a redevelopment plan was adopted existed at each stage of the implementation of the plan. We cannot conclude, however, that a redevelopment agency may make an initial finding of blight and rely on that finding indefinitely to amend and extend a redevelopment plan to respond to conditions that did not exist, or to accomplish objectives that were not contemplated, at the time

that the original plan was adopted. To do so would confer on redevelopment agencies an unrestricted and unreviewable power to condemn properties for purposes not authorized by the enabling statute and to convert redevelopment areas into their perpetual fiefdoms. For the same reason, a renewed finding of blight cannot be implicit in an amendment to a redevelopment plan approved decades after the original plan was adopted that addresses conditions and seeks to achieve objectives that were not contemplated in that plan. Such an amendment effectively constitutes, and should be subject to the same procedural requirements as, a new redevelopment plan.

In this case, unlike the condemnees in *Balmasian* v. *Boca Raton Community Redevelopment Agency*, supra, 580 So. 2d 199, and *Charleston Urban Renewal* v. *Courtland Co.*, supra, 203 W. Va. 528, the plaintiffs are not seeking a factual determination that blighted conditions no longer exist in order to prevent the completion of a redevelopment plan. Rather, they claim: (1) that the initial finding of blight does not relate to the redevelopment area identified for acquisition in the 1988 amendment that includes their property or to the proposed use of that property under the amended redevelopment plan; and (2) that, in the absence of a finding relating to that area, the defendants had no statutory authority to condemn the property. We agree.

First, we note that the record in this case does not establish the existence of any "incremental, multi-year, integrated plan for the overall redevelopment of a slum or blighted area"; *Charleston Urban Renewal* v. *Courtland Co.*, supra, 203 W. Va. 535; that included the acquisition of the plaintiffs' property. The property was not targeted for acquisition by the plan until the adoption of the 1988 amendments, twenty-five years after the adoption of the original plan and at a time when, as the defendants concede and, indeed, the amendment

itself acknowledges, the blight eradication objectives of the original plan largely had been achieved.[5] Second, that amendment was a response to a discrete economic condition that did not exist at the time that the 1963 plan was adopted, namely, the construction of a mall in another area of the city, and had distinct objectives.[6] Accordingly, we conclude that the 1988 amendments did not relate to the original finding of blight but constituted, in effect, a new redevelopment plan.

We also conclude that this case is distinguishable from *Fishman* v. *Stamford*, 159 Conn. 116, 119–20, 267 A.2d 443, cert. denied, 399 U.S. 905, 90 S. Ct. 2197, 26 L. Ed. 2d 560 (1970), in which this court concluded that the adoption of a modification to a redevelopment plan—indeed, the same plan that is under consideration in this case—to provide for the acquisition of property that was not targeted for acquisition under the original plan did not constitute the adoption of a new plan subject to the procedural requirements of § 8-127. In that case, the modification was adopted only three years after the original plan, was intended to alleviate the same conditions as the original plan and had the same objectives as the original plan, with only a change in scale. Under those circumstances, this court concluded

---

[5] The introduction to the amendments states that "[a]s Stamford enters the final phase of the Urban Renewal Project, most of the goals established by our community have been achieved." We emphasize that the fact that the goals of a redevelopment plan largely have been achieved does not automatically deprive a redevelopment agency of authority to complete the plan. The agency may not rely on the fact that the goals have not been completely achieved, however, to extend the period and scope of the plan indefinitely and to adopt new goals that were not contemplated in the original plan.

[6] The introduction to the amendments states that "[t]his document contains a description of Urban Renewal Plan amendments which, if approved by the Board of Representatives, will create new development goals for the section of Stamford's Urban Renewal Project Area referred to as Blocks 8 and 9." The introduction identified more housing in the downtown area and more nightlife and pedestrian-oriented activity as two such goals.

that compliance with the requirements of General Statutes § 8-136 pertaining to modifications of redevelopment plans was all that was required. Under that statute, any modification that "will substantially change the redevelopment plan as previously approved by the legislative body . . . must similarly be approved by the legislative body." If we were to construe that statute to apply to *any* change in a redevelopment plan, however, no matter how belated, substantial or unrelated to the original plan, then, after an initial finding of blight, the eminent domain power of a redevelopment agency effectively would be coextensive with the state's. Even after all of the objectives of the original plan had been achieved, the agency could continue to amend and extend the plan to achieve public purposes unrelated to the eradication of blight, subject only to the approval of the local legislative body.

Accordingly, we conclude that the trial court improperly determined that it was within the defendants' discretion not to make a renewed finding of blight. We emphasize that, under the redevelopment act, it is only with reference to a redevelopment area, i.e., a blighted area, "that a local redevelopment agency is authorized to prepare a plan for redevelopment and, in the execution of the plan, take private property by condemnation." *Gohld Realty Co.* v. *Hartford,* supra, 141 Conn. 142–43. The legislature has mandated that before a redevelopment agency may adopt a redevelopment plan, it must hold a public hearing pursuant to § 8-127 and determine that the area in which the proposed redevelopment is to be located is a redevelopment area, as defined by § 8-125 (b). Those procedures are designed to allow interested parties to present evidence and arguments concerning the existence of blight so that the agency can make an informed and accurate finding. They also ensure that there is an adequate record for judicial review. Because the defendants failed to comply with the requirements of § 8-127, the redevelopment

agency had no statutory authority to adopt the 1988 amendment that, we have concluded, constituted a new redevelopment plan, and the condemnation proceedings against the plaintiffs' property were invalid. See *Sheehan* v. *Altschuler*, supra, 148 Conn. 523–24.

The commission argues, however, that to require a renewed finding of blight under the circumstances of this case will "derail" urban renewal projects by depriving redevelopment agencies of the "authority to complete the redevelopment project as planned." We have two responses to that argument. First, our decision today does not require a redevelopment agency to renew a finding of blight if it is merely completing a redevelopment project as initially planned. Rather, the requirement for a renewed finding exists only when the agency, long after the original plan was adopted and at a time when the objectives of that plan have been largely achieved, has amended the original plan to address conditions and achieve objectives that did not exist at the time that the original plan was adopted. Second, to avoid being deprived of authority to address new conditions and achieve new objectives, the agency need only comply with the procedural requirements of § 8-127. Admittedly, one outcome of such proceedings could be a determination by the agency that there are no blighted conditions and, therefore, that it has no authority to proceed. The possibility of such an outcome, however, is precisely what the legislature contemplated in requiring the agency to hold such a hearing.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment granting the plaintiffs' claim for a permanent injunction against the condemnation of their property pursuant to the 1963 redevelopment plan as amended.

In this opinion the other justices concurred.